UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-347 (KES/VLD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **SENTENCING POSITION OF** |
| | ) | **THE UNITED STATES** |
| ROBERT PHILLIP IVERS, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Bradley M. Endicott and William C. Mattessich, Assistant United States Attorneys, respectfully submits its position on sentencing in the above-captioned case. For the reasons outlined below, particularly the need for specific deterrence and to protect the public, the United States recommends a sentence at the top-end of the applicable guideline range.

## I. Introduction

The defendant, Robert Ivers, has already served a BOP sentence for threatening to murder a federal judge. He now stands convicted of threatening another federal judge, an attorney who testified against him during his previous federal trial, and her family.

Ivers previously received an 18-month sentence. Four supervised release revocations followed, resulting in 36 additional months of prison. None of this

deterred him. Instead, Ivers returned to making threats, this time engaging in a campaign of retaliation against Judge RWP, who presided over his trial, and attorney AT who testified against him. He eventually assembled his grievances into 236-page manifesto titled *How to Kill a Federal Judge,* which contained graphic images of violence and threats against real people and their families. Ivers then mailed copies of his manifesto to numerous people, including federal judges and AT.

Previous sentences have failed to deter Ivers from making threats against those he believes have wronged him. His refusal to recognize the wrongful nature of his conduct, considered alongside his prior convictions for communicating threats and repeated violations on supervision, raises serious concerns that he will cruelly continue similar crimes in the future.

This case presents a clear and compelling need to deter the defendant and to protect the public. While the government recognizes Ivers's age and medical issue deserve consideration, he has yet to be deterred from making threats, and his own actions demonstrate that a long sentence followed by a maximum term of supervised release is the only thing that will stop Ivers from threatening people.

## II. Procedural Background and Guideline Calculations

On May 7, 2026, a federal grand jury returned a three-count Superseding Indictment against Ivers. Presentence Investigation Report "PSR" ¶ 1. Counts

One and Two charged Mailing a Threat to Injure the Person of Another, in violation of 18 U.S.C. § 876(c). Count Three charged Threatening to Murder a Federal Judge in violation of 18 U.S.C. § 115(a)(1)(B) and (b)(4). Following a four-day jury trial, Ivers was found guilty on all three counts. PSR ¶ 2. Sentencing is currently scheduled for November 24, 2026.

The Probation Office's PSR calculates a total offense level of 28 and criminal history category III, resulting in an advisory guideline range of 97-121 months' imprisonment.

## III. Nature and Circumstances of the Offense

The events leading to this prosecution began over a decade ago when Ivers filed a civil lawsuit in the District of Minnesota against an insurance company seeking approximately $100,000 in life insurance proceeds. PSR ¶ 9. United States District Judge WMW presided over the case. *Id.*

In June 2017, following a bench trial, Judge WMW ruled against Ivers. PSR ¶ 12. Judge WMW also concluded Ivers's testimony lacked credibility and that the insurance application contained willfully false or intentionally misleading information. *Id.* Ivers became hostile toward the court. In 2018, he threatened Judge WMW's life during a call with attorneys AT and LF when he tried to bring the same lawsuit a second time. PSR ¶¶ 16-17. This led to his first conviction for threatening a federal judge, resulting in an 18-month sentence from Judge RWP. PSR ¶ 19.

Following his release from prison in May 2024, Ivers expanded his grievances to include Judge RWP and attorney AT who testified during the first trial. While in prison, Ivers compiled a 236-page manifesto titled *How to Kill a Federal Judge*. Gov't Ex. 1. The manuscript's cover depicted an individual looking through a rifle scope. The contents featured violent imagery, broad threats against federal judges and specific threats directed at Judge RWP, attorney AT, and AT's family. PSR ¶¶ 24-26.




Gov’t Ex. 1, at 1.

The pages directed at Judge RWP showed that Ivers blamed the judge for his criminal conviction and sentence, where Ivers stated:

“Begging for your life won’t do you one bit of good judge.” “

> "I'm going to kill your kids, your family, and your friends for what you did."
>
> "You allowed a jury to convict me without one shred of proof you f*cking pig! Mark my words you will pay!"

PSR ¶ 23.

Between January and April 2025, Ivers mailed copies to numerous recipients, including all nine justices of the United States Supreme Court, three federal circuit judges, the law firm where AT worked, and the University of St. Thomas. PSR ¶¶ 30-34. The mailings prompted safety precautions for some of the recipients, as well as security and law enforcement responses to mitigate any possible threat of real violence. PSR ¶¶ 30-31, 33-34.

For AT, the mailing was especially disturbing. She knew of Ivers's previous threatening behavior. Now she was receiving retaliatory threats against her and her family. At trial, AT testified that became visibly shaken and cried after seeing the mailed threats. She did not know where Ivers was or whether he remained incarcerated. She feared for herself and her children and retrieved them from school early. Her law firm also arranged for additional security at AT's workplace and residence. PSR ¶ 33.

The portions that caused AT the most concern were threats that included promises of harm to children or entire families. One page of the manuscript underlined AT's name and included the statement "everyday I pray for the

death of your child c*nt!" PSR ¶ 25. Throughout the manifesto, Ivers wrote about killing children.







Gov't Ex. 2 at 5, 15







Gov. Ex. 2, at 24, 26.

In September 2025, Ivers's efforts to circulate the manifesto continued. On September 3, 2025, library staff alerted police to violent materials Ivers was printing, leading to his arrest. PSR ¶¶ 35-36. During the investigation, officers searched his vehicle and recovered approximately 20 copies of the manifesto, lists of federal judges and attorneys, promotional materials for the manifesto, a copy of the *Anarchist Cookbook*, a replica firearm, fireworks, and an image of a former pope with crosshairs over his head. PSR ¶ 37. Investigators also recovered information identifying AT and the address of her law firm. *Id.* Gov't Ex 31.

During a September 5, 2025 interview, an investigator asked Ivers whether he believed the manuscript would frighten people. PSR ¶ 38. Ivers acknowledged that frightening others was the intended effect of the manifesto, exclaiming "It was supposed to!" *Id.* He also discussed the publicity his arrest would generate and that "all the crazies would come out of the woodwork." *Id.*

## IV. The Guideline Calculations and the Defendant's Objections

### A. The Six-Level Enhancement For Conduct Evidencing an Intent to Carry Out the Threats

The defendant objects to the calculated six-level enhancement for conduct evidencing an intent to carry out the threats. The enhancement is based on the materials recovered during the September 2025 search of the defendant's vehicle, including the *Anarchist Cookbook*, a replica firearm, and fireworks.

The government does not seek application of this enhancement. After reviewing the trial record and applicable caselaw, the government does not believe the evidence sufficiently supports the enhancement in this particular instance. Application Note 1 to U.S.S.G. §2A6.1(b)(1) limits the scope of conduct to that occurring before or during the offense. The Note also requires that the conduct be substantially and directly connected to the offense. The Eighth Circuit has recognized this temporal limitation. *See United States v. Audstad*, 519 F.3d 431, 433-36 (8th Cir. 2008). Here, investigators recovered

the replica firearm and other concerning materials in September 2025 after Ivers mailed the threats.

To be clear, the contents of the vehicle do warrant concern and possibly an upward variance under §3553(a). *See id.* The recovered items were found alongside 20 copies of *How to Kill a Federal Judge*, a note containing the names and work addresses of Judge RWP and AT, and lists of federal judges. All of this together reflects Ivers's longstanding fixation on the individuals he blames for his perceived injustice.

The government's position should not be understood as minimizing the seriousness of the defendant's threat or prevent the Court from imposing a substantial sentence based on the defendant's multiple threats, the harm to his victims, and the need to protect the public from future threats by the defendant. The Court can appropriately still account for those circumstances under 3553(a). Notwithstanding this enhancement, Ivers has earned a top-end sentence.

B. The Two-Level Enhancement For Making Public Threats Risking Incitement of Violence

The defendant also objects to the two-level enhancement for making public inciting threats under U.S.S.G. §2A6.1(b)(5). The government submits that the enhancement applies.

Section 2A6.1(b)(5) applies when a defendant convicted under 18 U.S.C. § 115 makes a public threatening communication that he knew or should have known created a substantial risk of inciting others to violate that statute. In this instance, Ivers not only harassed individuals he hated, he was also committed to a sustained effort to publish and promote *How to Kill a Federal Judge* to a wider audience. PSR ¶¶ 21, 30. During trial, he expressed his intention to publish *How to Kill a Federal Judge* as a book. The PSR reflects this truth. He brought the manuscript to two commercial print shops in an effort to reproduce copies. PSR ¶ 29. He later brought it to a public library for the same purpose. PSR ¶ 35. He prepared promotional flyers and mailed copies of the manuscript to numerous recipients, identifying the materials as advanced promotions. PSR ¶¶ 35, 37.

As for the risk of incitement to violence, Ivers characterized the manuscript as a "blood soaked killing guide" directed at federal judges and other people he reviled. PSR ¶ 21. In the manuscript, Ivers "enthusiastically gives instruction then coaches radicals and extremists on how to train, plan, hunt, stalk, and kill anyone." *Id.* That particular passage reads on, "Ivers killing guide *How to Kill a Federal Judge* is designed to teach extremists on how to train, plan, hunt, stalk, and kill anyone including judges, their family members, politicians, and more!" *Id.* His efforts to reproduce, advertise, and distribute the manuscript, and the distribution of promotional material,

support the conclusion that he sought to communicate its threatening content to the public.

Ivers's own statements reinforce that his efforts were meant to inspire violence. During his September 2025 interview, he told law enforcement that his arrest would provide free publicity for the manuscript and that "all of the crazies would come out of the woodwork." PSR ¶ 38. That statement is significant when considered alongside the manuscript's repeated and explicit call to violence. Ivers understood that publicity would bring his work to the attention of potentially unstable individuals (including, "an army of 2,000,000 felons," "assassins," and "thugs" as he put it), yet he continued trying to promote its distribution. PSR ¶ 22, Gov't Ex. 1.

The government does not contend that Ivers actually persuaded another person to commit a crime. However, §2A6.1(b)(5) does not require that result. The question is whether his public threatening communications created a substantial risk of inciting others to violate § 115, and whether he knew or should have known of that risk. Here, a plain reading of the manuscript's content makes clear that Ivers wished to inspire violence with his manifesto. The government therefore respectfully requests that the Court overrule the defendant's objection and apply the two-level enhancement under §2A6.1(b)(5).

C. The Two-Level Enhancement for Making More Than Two Threats

Ivers also objects to the two-level enhancement under §2A6.1(b)(2)(A), which applies when an offense involves more than two threats. There should be little debate whether this enhancement applies. Here, Ivers mailed copies of his manifesto to separate recipients, including members of the Supreme Court, other federal judges, a newspaper, a university employee, and AT's law firm. PSR ¶ 30. Solely on the mailings above, Ivers made more than two threatening communications. The Court should therefore overrule his objection and apply the two-level enhancement.

D. The Two-Level Enhancement for Obstructing Justice

The government seeks a two-level increase under §3C1.1 because Ivers gave materially false testimony during trial. While a defendant has the right to testify in his own defense, a defendant does not have the right to commit perjury. Under *United States v. Dunnigan*, 507 U.S. 87, 94–95 (1993), an obstruction enhancement is applicable when a defendant knowingly gives false testimony concerning a material matter with the willful intent to deceive, rather than through confusion, mistake, or faulty memory. In the context of assessing obstruction or perjury, the Eighth Circuit has repeatedly recognized that a judge who presided over the trial may rely on the judge's own recollection of the testimony heard firsthand. See *United States v. Nichols*, 416

F.3d 811, 821–22 (8th Cir. 2005); *United States v. Reed*, 978 F.3d 538, 545 (8th Cir. 2020).

The government identifies two instances of materially false testimony.[1] During trial, Ivers testified, in substance, that his references to killing a judge merely meant destroying the judge's career or reputation, rather than communicating threats of physical harm. That explanation cannot be reconciled with the evidence at trial. One only need to view the cover of the manifesto to know this is false. The manifesto is replete with graphic descriptions and depictions of physical violence. It also includes threats involving children, which cannot plausibly be characterized as attempts to damage anyone’s professional reputation or career. Ivers’s testimony here was simply a perjurious effort to provide an innocent explanation for mailing the threats to AT and others.

Ivers also testified that he sent the manifesto to AT's law firm solely for the purpose of obtaining publishing advice. He also testified that he only intended to send the manifesto to the named attorneys on the firm’s masthead. The evidence at trial tells a different story. The only persons Ivers knew at the law firm were AT and LF. There was also no accompanying letter in the mailing requesting publishing advice. Significantly, when investigators later

[1] The United States ordered the trial transcript but its production is still pending as of the date of this filing.

searched Ivers's vehicle in September 2025, they recovered a document listing AT's name with her law firm's address. PSR ¶ 37; Gov't Ex. 31. Ivers's entire defense theory rested on the premise that he believed AT no longer worked at the firm and that he was engaged in an earnest publishing effort with other lawyers he never met. As demonstrated by the evidence, that was false.

Both statements concerned material issues at trial. The meaning of the manuscript and the purpose of its distribution to harass and intimidate AT was at the heart of the government's case and was unanimously accepted by the jury. Iver's willingness to fabricate explanations under oath underscores his complete lack of respect for both the court and the victims. The government therefore asks the Court to evaluate the defendant's purposely misleading testimony against the trial evidence and apply the two-level adjustment for obstruction of justice.

## V. The Section 3553(a) Factors and Recommendation for a Top-End Sentence

The central problem in this case is deterrence. Ivers has been through the federal criminal justice system before. He has served a prison sentence for threatening a judge. He has had his supervised release revoked multiple times resulting in more time in prison. Yet here he is again, convicted of threatening people associated with his earlier legal proceedings. The Court need not speculate about whether previous punishment was enough. It was not. Ivers's

history weighs heavily in favor of a top-end guidelines sentence, both to deter him from committing further offenses and to protect those who he blames for his prior federal conviction.

Ivers' conduct was not an isolated expression of anger. Rather, the evidence and his criminal history demonstrates a long pattern of responding to perceived wrongs with intimidation and threats. Even now, Ivers's continues to rage against his conviction and refuses to acknowledge the harms he has inflicted. His post-trial filings demonstrate that he continues to regard himself as the wronged party maintaining that he is entitled to distribute his manifesto regardless of the fear and disruption he caused. Doc. Nos. 162, 163, 164, 165, 168, 170, 175, 180. All of this leads to the conclusion that only a long sentence will keep Ivers from sending new threats of violence.

The nature of the present offenses reinforces that conclusion. Ivers ultimately returned to the same kind of threatening conduct for which he had previously been convicted. This time, he thought he found a way to continue his unlawful campaign of retribution by calling his threats a book. He was wrong. Real harms followed whenever Ivers's mailed his manifesto and the consequences were severe. The recipients contacted security personnel and the police. Parents were left shaken and removed their children from school. Employers implemented additional security measures. Substantial law enforcement resources were devoted to investigating the threats. But to Ivers,

everyone else is the problem, not him. He is defiant in his belief that these consequences were not the product of his own conduct. His refusal to accept responsibility, coupled with his return to threatening conduct despite a prior federal conviction and sentence, underscore both his risk of reoffending and the need to protect the victims.

Particularly troubling, Ivers directed threats at a witness from his prior federal trial and her family. That conduct warrants significant weight at sentencing. Threatening a witness who participated in a criminal prosecution is indisputably harmful to the administration of justice and sends a chilling message to all victims who testify in open court. It was likely a difficult experience for AT when she testified in the first federal trial. It was undoubtedly more traumatic for AT when she had to testify about Ivers's retaliation at the second trial.

The current threat environment involving the federal judiciary bears mentioning here. Between 2013 and 2024, hostile threats and communications against federal judges have more than tripled. John G. Roberts, Jr. *2024 Year-End Report on the Federal Judiciary* 7 (Dec. 31, 2024). There is of course no place for violent threats directed at judges for doing their jobs. Intimidation of judicial officers is at minimum, profoundly destabilizing to court operations. More fundamentally, it strikes at very heart of one of our constitutional pillars.

Ivers's sentence should make crystal clear that such threats of violence cannot and will not be normalized.

Ivers's age and medical condition matter in adjudging this sentence but must be weighed against other important sentencing considerations. True, Ivers is 73 years old and suffers from serious coronary artery disease. Those circumstances warrant thoughtful consideration. At the same time, the Court must balance those considerations against the seriousness of the offenses, the need to deter Ivers from reoffending, and the need to protect the public. In contrast to Iver's poor health and age, Ivers himself has shown that one need not be particularly young or healthy to convey threats of violence toward others. Whether a person chooses to engage in this kind of criminal conduct does not depend on health or age. Rather, it rests on accepting that such conduct violates societal norms and the sense of safety all deserve. This is a notion that Ivers refuses to accept or abide by. Because prior sentences have not deterred him from issuing threats, a substantially longer sentence is necessary here. It is the only thing that will stop Ivers's threatening behavior. Protecting the public from future criminal threats is itself a legitimate and substantial sentencing concern and it should be clearly reflected in Ivers's sentence.

## CONCLUSION

The government therefore submits that a sentence at the top of the properly calculated advisory guideline range would adequately address the seriousness of the offenses, provide just punishment, and promote specific deterrence and public protection.

For these reasons, and after consideration of the factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court impose a top-end guidelines sentence, together with a maximum term of supervised release.

Dated: November 17, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*/s/ Bradley M. Endicott*
BY: BRADLEY M. ENDICOTT
WILLIAM C. MATTESSICH
Assistant United States Attorneys